UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL GILMORE                         *    CIVIL ACTION NO. 17-1026
                                        *
VERSUS                                  *    SECTION: "F"(1)
                                        *
NANCY  A.  BERRYHILL,  ACTING           *    JUDGE MARTIN L. C. FELDMAN
COMMISSIONER   OF   THE   SOCIAL        *
SECURITY ADMINISTRATION                 *    MAGISTRATE JUDGE
                                        *    JANIS VAN MEERVELD
*************************************    *

REPORT AND RECOMMENDATION

The plaintiff, Michael Gilmore, seeks judicial review, pursuant to Section 405(g) of the

Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") finding that the plaintiff's disability has ended under Section

223(f) of the Act.  The matter has been fully briefed on cross-motions for summary judgment. For

the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by

the plaintiff (Rec. Doc. 11) be DENIED; and the Motion for Summary Judgment filed by the

Commissioner (Rec. Doc. 12) be GRANTED.

**Procedural Background**

Mr. Gilmore was found disabled under the Act as of September 15, 2009. At that time, he

had the following medically determinable impairment: residuals of an open wound to the upper

limb. This impairment was found to result in the residual functional capacity to perform light work,

except with gross and fine manipulative limitations, including occasional handling; a limitation to

1,2,3 step procedures; a requirement that he withdraw from the work station at unscheduled times,

and a limitation of diminished concentration and pace.  Mr. Gilmore was notified by a Disability

Determination and Transmittal dated December 10, 2013, that the state agency had determined

that he was no longer disabled as of November 27, 2013. This determination was upheld upon reconsideration after a disability hearing by a State agency Disability Hearing Officer.

Mr. Gilmore requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held before the ALJ on October 6, 2015.[1] On January 15, 2016, the ALJ issued an adverse decision. The Appeals Council denied review on December 8, 2016.

On February 6, 2017, Mr. Gilmore filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs.). The parties filed cross-motions for summary judgment. (Rec. Docs. 11, 12). Mr. Gilmore is represented by counsel.

## Evidence in the Record

Mr. Gilmore is right-handed. R. at 33. He worked as a sandblaster painter until September 15, 2009, when his right forearm was injured going through the glass of a window. R. at 33-34. On September 19, 2009, Mr. Gilmore had a surgery the ALJ described[2] as right radial artery ligation and complex closure of 8 cm laceration and 4cm laceration. R. at 34. At a post-operative follow up appointment about two weeks later, Mr. Gilmore reported pain at a level of 8 out of 10, but was noted to have handgrip of 5 out of 5. R. at 85. At that appointment he was referred for evaluation of a possible tendon injury. R. at 85. On October 14, 2009, Mr. Gilmore presented to the Medical Center of Louisiana at New Orleans with hand pain. R. at 85; R. at 313. He had some scar tissue and swelling, though his forearm was not tight. R. at 85; R. at 314. Mr. Gilmore was referred to occupational therapy "so he can get his grip strength back." R. at 314.

---

[1] The original hearing scheduled for September 4, 2015, was continued so that Mr. Gilmore could obtain legal representation.

[2] The record before the Court includes the ALJ's 2010 decision, the transcript of the 2010 hearing before the ALJ, as well as the October 14, 2009 treatment record. For the two prior medical records, the Court recounts the ALJ's 2010 summary.

2

At the time of the May 25, 2010, hearing, Mr. Gilmore testified that he had only been prescribed ibuprofen for the pain, but that it did not help. R. at 37. Mr. Gilmore explained that he felt numbness, swelling, and pain in his right hand. R. at 35. The discomfort would cause him to wake during the night. R. at 35. He said he could move his thumb, but could not really move his other fingers. R. at 35. He stated that he could grasp small objects like a penny, using his thumb. R. at 35. He said he could hold an object of about three to five pounds, but he could not hold anything heavy like a case of water. R. at 35. He testified that he had trouble shaving and tying his shoes. R. at 38. Mr. Gilmore explained that he had no trouble walking, but could no longer climb a scaffold as he had done in his previous work. R. at 39. He said that he could not push a lawnmower unless he tried to do so with his left hand. R. at 38.  He said that he was taking a nap of about three hours daily. R. at 39.

Following the May 25, 2010, hearing, the ALJ determined that Mr. Gilmore had been under a disability as defined in the Act since September 15, 2009. R. at 87. The ALJ found Mr. Gilmore was symptomatic for right hand pain, swelling, and numbness that results in reduced grip strength, handling, and gross and fine manipulation. R. at 86. The ALJ found Mr. Gilmore had the residual functional capacity to perform light work, except he had gross and fine manipulative limitations, including occasional handling; was limited to 1,2,3, step procedures; must withdraw from the work station at unscheduled times; and has diminished concentration and pace limitations. R. at 84. The ALJ found there were no jobs that existed in significant numbers in the national economy that Mr. Gilmore could perform. R. at 86. The ALJ noted that Mr. Gilmore had been referred to physical therapy. R. at 86.  In addition to finding Mr. Gilmore was under a disability, the ALJ concluded that "[m]edical improvement is expected with appropriate treatment." R. at 87. The ALJ

recommended a "continuing disability review" to be conducted 18 months following the decision. R. at 87.

The first medical record following the disability determination is for Mr. Gilmore's July 31, 2012, visit to Dr. Paul Marquis with Ochsner. R. at 248. It was noted that Mr. Gilmore was seen for back pain and rash. R. at 250. In a review of systems, Mr. Gilmore reported persistent pain in his right lower arm and wrist. R. at 249. However, it does not appear any diagnosis or treatment for such pain was made.

On November 15, 2012, Mr. Gilmore followed up with Dr. Marquis for elevated cholesterol. R. at 250. There were no reports or diagnoses related to Mr. Gilmore's right arm, wrist, or hand.

On May 18, 2013, Mr. Gilmore completed a form Continuing Disability Review Report. He reported that he had no strength in his arm and could not hold on to any objects. R. at 180. On a page with check boxes, he reported that he had difficulty dressing, lifting objects, using his arm, and using his hands or fingers. R. at 189. He reported he did not have difficulty concentrating, understanding or following directions, or completing tasks. R. at 189.

On September 19, 2013, he followed up with Dr. Marquis for elevated cholesterol. R.at 266. His problem list included only hyperlipidemia. R. at 265. He reported episodes of chest pain at rest and also reported continued discomfort and weakness in his right arm. R. at 266. It was noted that he had an enlarging tender soft tissue mass in the right malar area. R. at 266. Atrophy of muscles in right forearm and hand were also noted. R. at 266. No diagnoses or treatment related to his arm or hand were made. He was assessed with dyslipidemia under good control. R. at 266. He was continued on atorvastatin (a lipid lowering medication) and instructed to follow up in six months. R. at 266.

Dr. Miljana Mandich of Internal Medicine Associates performed a consultative examination of Mr. Gilmore on November 12, 2013. R. at 256. Mr. Gilmore complained of trouble with his right arm and reported that it was difficult for him to pick up small objects. R. at 256. The only medication reported was atorvastatin. R. at 256. Upon physical examination, Dr. Mandich determined that Mr. Gilmore had full range of motion of all joints, full range of motion of his right hand and all of the fingers, could open and close his empty fist and perform other fast repetitive movements without any noticeable impairment. R. at 258. For example, Mr. Gilmore could tap his fingers against his thumb. R. at 259. Dr. Mandich noted that Mr. Gilmore had normal mobility of the thumb and normal grip strength, grasping, and dexterity bilaterally. R. at 258. Dr. Mandich noted that muscle tone, bulk, and strength were preserved in all four extremities. R. at 258. Dr. Mandich noted that Mr. Gilmore reported that sometimes his whole right hand and all of the fingers go to sleep. R. at 258. But Dr. Mandich noted that at the time of examination, Mr. Gilmore had normal sensation in the right hand and all fingers. R. at 259. Dr. Mandich concluded that Mr. Gilmore's "physical exam [was] completely unremarkable." R. at 259. She further concluded that she observed no evidence of significant functional impairment of the right upper extremity, though she noted that it was possible that when Mr. Gilmore experiences paresthesias in the right hand and fingers that it would be difficult to pick up and manipulate very small objects. R. at 259.

On November 27, 2013, the state agency issued an Explanation of Determination, which concluded that Mr. Gilmore had experienced medical improvement and was no longer considered disabled as of that date. R. at 90. The disability examiner explained that a consultative examination had been obtained and it showed no atrophy or muscle weakness, Mr. Gilmore had normal grip, grasp, and dexterity bilaterally, and was able to perform repetitive movement with his right arms, hand, and fingers. R. at 90. Although occasional numbness was reported, his sensory examination

was normal throughout. R. at 90. Mr. Gilmore timely requested reconsideration of the disability cessation determination. R. at 96.

On January 30, 2014, Mr. Gilmore returned to Dr. Marquis and complained of numbness and hand pain. R. at 271. On a review of symptoms, no numbness on palmar aspect of hand was reported. R. at 272. Upon physical examination, mild atrophy dorsum of hand was noted. R. at 272. It was also noted that Mr. Gilmore had good range of motion "of fingers and thumbs do some obvious weakness."[3] R. at 272. Gabapentin was prescribed. R. at 272. He was assessed with neuropathy, traumatic injury to the right radial nerve. R. at 272. He was ordered to return if symptoms worsen or fail to improve. R. at 272.

On May 31, 2014, Dr. Joseph Michalik performed a physical residual functional capacity assessment as a medical consultant in conjunction with the reconsideration of the cessation of disability finding. R. at 273-81. After reviewing Mr. Gilmore's case file, he concluded that Mr. Gilmore could occasionally lift 20 pounds and frequently lift 10 pounds. R. at 274. No manipulative limitations were established. R. at 276.

On August 19, 2014, Mr. Gilmore was seen by Dr. Mahmoud Sarmini. R. at 286. Mr. Gilmore presented with chronic right hand numbness. R. at 286.  R. at 287. Mr. Gilmore reported that the numbness was getting progressively worse over the last few months. R. at 287. He described a constant numbness through the whole hand that is usually activated by use of the hand. R. at 287. He complained of weakness in his right hand grip and said he occasionally dropped small objects. He reported minimum pain of 7 on a scale of 10 and maximum pain of 8-9. R. at 287.  It was noted that he was taking gabapentin with suboptimal relief. R. at 287. Upon physical examination, it was noted that he had no apparent muscle atrophy in his hand. R. at 287. Right

---

[3] In reviewing this medical record, the ALJ found the phrase "do some obvious weakness" to be unclear.

upper extremity had hand grip of 4 out of 5 and finger abduction was 4 out of 5. R. at 287. His right upper extremity was positive for Tinel's test, Carpal Compression test, and Reverse Phalen's test. R. at 288. His sensation to pinprick on the right upper extremity was intact. R. at 288. Mr. Gilmore was assessed with numbness and tingling in the right hand, likely due to radial neuropathy. R. at 288. His prescription of gabapentin was increased and an electrodiagnostic study was ordered. R. at 288.

On September 26, 2014, Mr. Gilmore presented at the Ochsner medical Center for an Electromyography/Nerve Conduction Study ("EMG/NCS"). R. at 293. The summary of results reported "[n]o radial sensory potential was identified," "[a]ll other nerves including the radial motor were within normal limits," and "[n]o abnormalities noted on EMG of distal limb muscles." R. at 294. Dr. Frank Oser concluded "radial sensory neuropathy, likely due to remote forearm trauma." R. at 294.

Mr. Gilmore returned to Dr. Sarmini on October 3, 2014. R. at 296. Mr. Gilmore reported his numbness was slightly better, but was still a constant sensation in his whole right hand. R. at 297. He reported maximum pain of 7 out of 10 and minimum pain of 5-6. R. at 297. He denied significant weakness of his hands, but reported problems with occasionally dropping things. R. at 297. On his right upper extremity, his hand grip and finger abduction were again 4 out of 5. R. at 297. Dr. Sarmini discussed the results of the EMG/NCS with Mr. Gilmore. R. at 298. Mr. Gilmore was assessed with neuropathy of right radial nerve and numbness and tingling in right hand, and his prescription for gabapentin was continued at the increased level ordered in August 2014. R. at 298.

A one page medical record from Ochsner indicates that Mr. Gilmore had an encounter on December 3, 2014. R. at 300. His problem list included hyperlipidemia, neuropathy, numbness

and tingling in right hand, and neuropathy of right radial nerve. R. at 300. Medications at the start of the encounter were reported as atorvastatin (Lipitor), gabapentin (Neurontin), and venlafaxine (Effexor). R. at 300. There is no record of examination for this encounter.

Mr. Gilmore was seen by Dr. Marquis on April 1, 2015, for a routine physical examination. R. at 306. He reported persistent hand and wrist pain. R. at 306. Oxycodone-acetaminophen (Percocet) was prescribed. R. at 309.

A single page in Mr. Gilmore's medical records indicates an encounter at Ochsner on September 2, 2015, where "[n]europathy of right radial nerve" and "[n]umbness and tingling in right hand" were noted on his problem list and his current medications were listed as atorvastatin (Lipitor), gabapentin (Neurontin), oxycodone-acetaminophen (Percocet), venlafaxine (Effexor). R. at 317.

In conjunction with his request for reconsideration of the cessation of disability determination, a disability hearing officer reviewed Mr. Gilmore's file and on July 25, 2014, concluded that Mr. Gilmore was not disabled. R. at 108. Mr. Gilmore requested a hearing before an ALJ. R. at 111. After the initial hearing was continued so that Mr. Gilmore could obtain counsel, a hearing was conducted on October 6, 2015. R. at 47.

On October 6, 2015, Mr. Gilmore testified that his doctors had told him that his arm will never fully heal. R. at 53. He testified that his arm still feels numb and that is why he was prescribed Gabapentin. R. at 54. He described his pain as 7 on a scale of 10. R. at 54. He testified that it is hard for him to pick up small things like dimes and pennies. R. at 54.

Mr. Gilmore testified that during a normal day, he watches television or walks. R. at 56. He said he walks five to six miles three or four times a week. R. at 56. He said he could not help with chores because he would drop things. R. at 57. But he testified that he can write and eat using

his right hand. R. at 58. He said he could make a fist with his right hand, but not a tight fist. R. at 58. He also testified that he could lift 40 pounds with his right arm. R. at 58. The ALJ asked whether Mr. Gilmore does anything with his right hand or right side that might explain why he was not experiencing atrophy on that side, but Mr. Gilmore said he did not do anything with his right hand except eat. R. at 59.

Vocational expert Mary Alvier testified at the hearing on October 6, 2015. R. at 62. She testified that Mr. Gilmore's past work as a sandblaster was coded as DOT 503.687-010 and is considered medium and unskilled with an SVP of 2. R. at 62. She classified the spray-painting portion of his work as DOT 741.687-018, which is considered medium and unskilled with an SVP of 2. R. at 62.

The ALJ asked Ms. Alvier to consider a hypothetical individual with Mr. Gilmore's age, education, and past work experience who would be off task at least 20 percent of the day in addition to normal breaks and lunch. R. at 62. Ms. Alvier said there would be no jobs for this person in the national economy. R. at 62.

The ALJ asked Ms. Alvier to consider a hypothetical individual with Mr. Gilmore's age, education, and past work experience who is limited to light work but could never climb ladders, ropes, or scaffolds, and could occasionally balance, stoop, crouch, kneel, crawl, climb ramps, and climb stairs; but the individual could not work with moving or dangerous machinery, could not work at unprotected heights, and could not engage in commercial driving. R. at 62-63. The person would also be limited to unskilled work. R. at 63. Ms. Alvier testified that such a person could not perform Mr. Gilmore's past work, but could perform work as a dishwasher (light with an SVP of 1), cashier (light with an SVP of 2), and usher (light with an SVP of 2). R. at 63. She testified that in the national economy there would be 147,500 jobs; 1,185,900 jobs; and 89,500 jobs available,

respectively. R. at 63. And in Louisiana, the available jobs would be 1,860; 22,500; and 970, respectively. R. at 63.

The ALJ next asked Ms. Alvier to consider the same individual described in the second hypothetical, but with the additional limitation of no functional use of the right hand. R. at 64-65. Ms. Alvier testified that the person would not be able to work as a dishwasher or cashier. R. at 65. She said the person could work as an usher, but the number of usher jobs that the person could perform would be reduced by 50%. R. at 65.

The ALJ next asked Ms. Alvier to change the limitation in the previous hypothetical to only occasional use of the right hand for handling, fingering, and feeling. R. at 67. Ms. Alvier said the dishwasher and cashier position would still not be appropriate. R. at 67. She testified that the usher job would be available at 970 jobs in Louisiana and 89,500 jobs nationally. R. at 67. Ms. Alvier said other jobs would also be available, such as receptionist or information clerk (for example DOT number 237.367-018, a light position with SVP of 2), though she would reduce the number of such jobs available to 650 in Louisiana and 45,000 nationally. R. at 67.

## Decision of the Administrative Law Judge

In the decision under review, the ALJ engaged in the eight step analysis required by the regulations in evaluating whether a claimant continues to be disabled. These steps are as follows:

1. Is the claimant engaging in substantial gainful activity?

2. If not, does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

3. If not, has there been medical improvement?

4. If so, is the medical improvement related to the claimant's ability to do work?

5.  If there has been no medical improvement or the medical improvement is not related to the claimant's ability to work, do any of the exceptions apply?

6.  If one of the exceptions applies or if there is medical improvement related to the claimant's ability to work, are current impairments in combination severe?

7.  If so, is the claimant able to engage in substantial gainful activity (that is, an assessment of the claimant's residual functional capacity and a determination of whether claimant can perform past relevant work)?

8.  If not, can he claimant do other work given the residual functional capacity assessment and the claimant's age, education, and past work experience?

See 20 C.F.R. 404.1594.

Here, the ALJ first determined that the most recent favorable medical decision finding Mr. Gilmore was disabled is the decision dated June 21, 2010, and is known as the "comparison point decision" or CPD. The ALJ determined that, as noted above, at the time of CPD, Mr. Gilmore had a medically determinable impairment of "residuals of an open wound to the upper limb" and that this impairment was found to result in the residual functional capacity to perform less than the full range of light work with the limitations noted above. R. at 13-14. The ALJ found that through November 27, 2013, the date Mr. Gilmore's disability ended, Mr. Gilmore did not engage in substantial gainful activity. R. at 14. The ALJ determined that the medical evidence establishes that Mr. Gilmore did not develop any additional impairments after the time of CPD through November 27, 2013. R. at 14. Thus, the ALJ found that Mr. Gilmore continued to have the same impairment that he had at the time of CPD. R. at 14. The ALJ determined that since November 27, 2013, Mr. Gilmore has not had an impairment or combination of impairments which met or

medically equaled the severity of an impairment listed at 20 C.F.R. 404, Subpart P, Appendix 1. R. at 14.

The ALJ next found that medical improvement occurred as of November 27, 2013. R. at 14. In making this finding, the ALJ considered the medical evidence in the record and concluded that Mr. Gilmore has good range of motion of the hand and arm and only mild (if any) atrophy of the hand. R. at 14-15.

The ALJ then determined that as of November 27, 2013, Mr. Gilmore has the residual functional capacity to perform light work, except he is limited to unskilled work and he should never climb ladders; only occasionally balance, stoop, crouch, kneel and crawl; only occasionally climb ramps and stairs; not work with moving and/or dangerous machinery or at unprotected heights; and not engage in commercial driving. R. at 15. The ALJ determined that Mr. Gilmore's medical improvement is related to the ability to work because it resulted in an increase in his residual functional capacity. R. at 17. In making this determination, the ALJ considered all of Mr. Gilmore's symptoms, including Mr. Gilmore's testimony regarding those symptoms. R. at 15-16. The ALJ found that although Mr. Gilmore's impairment could have reasonably been expected to produce some of the alleged symptoms, Mr. Gilmore's statements regarding the intensity, persistence, and limiting effects were not credible to the extent inconsistent with the residual functional capacity found by the ALJ. R. at 16. The ALJ observed that there was little to no treatment for the alleged problems with Mr. Gilmore's right arm until after he was told his benefits were being ceased. R. at 16. The ALJ considered Mr. Gilmore's medical records and concluded that much of Mr. Gilmore's testimony was not corroborated and much of it appeared exaggerated. R. at 17.

The ALJ found that as of November 27, 2013, Mr. Gilmore's impairment has been severe and that as of the date, Mr. Gilmore has been unable to perform past relevant work. R. at 18. The ALJ determined that Mr. Gilmore was classified as a "younger individual" aged 18-49 on November 27, 2013. R. at 18. The ALJ found Mr. Gilmore had limited education and is able to communicate in English. R. at 18. The ALJ found that transferability of job skills is not at issue because Mr. Gilmore's past work is unskilled. R. at 18. After considering the testimony of the vocational expert, the ALJ determined that as of November 27, 2013, through the date of decision, considering Mr. Gilmore's age, work experience, and residual functional capacity, Mr. Gilmore has been able to perform a significant number of jobs in the national economy. R. at 18. Thus, the ALJ determined that Mr. Gilmore's disability ended as of November 27, 2013, and he has not become disabled at any time since that date through the date of decision. R. at 19.

### Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ's residual functional capacity findings are supported by substantial evidence?

### Analysis

## I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the

evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Termination of Benefits under the Act.

Once an individual has been found disabled under the Act, the individual's disability benefits can be terminated if substantial evidence demonstrates that "(A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity." Griego v. Sullivan, 940 F.2d 942, 943–44 (5th Cir. 1991) (quoting 42 U.S.C. § 423(f)). Because the Secretary has found the claimant disabled, the claimant "is entitled to a presumption of continuing disability." Gill v. Heckler, 740 F.2d 396, 397 (5th Cir. 1984) ("The basis for [the] presumption [of continuing disability] is that a prior determination of disability is binding on all parties to the hearing and has a res judicata effect as to that record."); see Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002) ("Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled.").

According to the applicable regulations, "Medical improvement is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594 (b)(1). A decrease in medical severity is "related to the individual's ability to work" when there has also been an increase in the claimant's "functional capacity to do basic work activities." Id. § 404.1594 (b)(3). A finding that medical severity has decreased "must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." Id. § 404.1594 (b)(1).

The second part of the evaluation is whether the claimant is able to engage in substantial gainful activity, which is similar to the standard governing initial determinations except for the burden proof which, as noted above, lies with the Secretary. Griego, 940 F.2d at 944. Substantial gainful activity is "work activity involving significant physical or mental abilities for pay or profit." Joseph v. Astrue, 231 F. App'x 327, 330 (5th Cir. 2007) (quoting Newton v. Apfel, 209 F.3d 448, 452 (5th Cir.2000)). "The ability to engage in substantial gainful activity is determined through an 'objective assessment of [the] functional capacity to do basic work activities' and a consideration of vocational factors." Id. (quoting 20 C.F.R. § 404.1594(b)(5)). In termination proceedings the Secretary engages in the eight step analysis described above when assessing substantial gainful activity. Griego, 940 F.2d at 944 n. 1.

### III.    Plaintiff's Appeal.

Mr. Gilmore's counsel argues that the ALJ failed to properly consider Mr. Gilmore's sensory deficits, right radial nerve neuropathy, and chronic pain and weakness. He points to the following evidence that he says the ALJ failed to consider:  4/5 right hand grip and 4/5 right finger abduction noted by Dr. Sarimini twice in August and October 2014; Dr. Oser's conclusion that

Mr. Gilmore had radial sensory neuropathy; the increase of Mr. Gilmore's prescription for gabapentin in August or September 2014; the prescription of Percocet starting in November 2015; and the physical examination in August 2014 showing positive Tinel's test, Carpal Compression test, and Reverse Phalen's test. Counsel for Mr. Gilmore insists that manipulative limitations should have been included in Mr. Gilmore's residual functional capacity.

The Commissioner counters that substantial evidence supports the residual functional capacity assigned by the ALJ. The Commissioner cites Mr. Gilmore's minimal treatment prior to the cessation of disability benefits and argues that it is appropriate to consider the failure to seek treatment as weighing against the claimant's credibility. For example, in Clayborn v. Astrue, the Fifth Circuit affirmed the district court's finding that substantial evidence supported the ALJ's determination that the plaintiff's subjective complaints of pain lacked credibility. 260 F. App'x 735, 737 (5th Cir. 2008). Noting that the ALJ's credibility determinations are "generally entitled to great deference," the Fifth Circuit observed that:

> Appellant had initially reported a full recovery after physical therapy and only later indicated that physical therapy did not help much. Moreover, although Appellant testified that he suffers from high levels of pain, he did not seek treatment for a period of almost two years, has not been prescribed pain medication, and reported that he still engages in normal social interactions such as taking care of his disabled mother, fishing, visiting friends, and seeing an occasional football game.

Id.

Here, Mr. Gilmore's treatment of his right hand and arm prior the cessation of disability benefits is indeed non-existent. The medical records show one report of pain in Mr. Gilmore's right lower arm and wrist in July 2012, with no associated treatment. In November 2012, there were no reports or diagnoses related to the right arm, wrist, or hand. In September 2013 (before cessation of benefits but after he had filled out a Continuing Disability Review Report), Mr. Gilmore reported continued discomfort and weakness in his right arm. Although the September

2013 medical record notes atrophy of muscles in Mr. Gilmore's right arm, there is no treatment related to Mr. Gilmore's right arm or hand. There is no recitation or report of any functional limitations in July 2012 or September 2013. Thus from the time of the May 25, 2010, hearing through the time Mr. Gilmore was notified that his disability benefits were being terminated, no treatment was provided to Mr. Gilmore for the alleged right lower arm discomfort in the form of medication, physical therapy, or anything else. Indeed, at the time of his November 2013 consultative examination, Mr. Gilmore was not taking any medication for pain. This lack of treatment indicates that Mr. Gilmore had seen improvement in his hand pain and functioning. It was not until his consultative examination in November 2013 that he complained of occasional numbness and it was not until after Mr. Gilmore received notice that his benefits had ceased that on January 30, 2014, he was prescribed medication for his hand and arm related complaints for the first time since his initial disability determination.

The Commissioner also points to the ALJ's consideration of the findings of consultative examiner Dr. Mandich, who concluded Mr. Gilmore had full range of motion in his right hand and fingers, was able to open and close his right hand without noticeable impairment, had normal muscle tone, and had normal grip strength, grasping, and dexterity. Dr. Mandich noted no muscle atrophy. The Commissioner further notes that the ALJ considered the conclusions of state agency medical consultant Dr. Michalik who determined that Mr. Gilmore could perform light work without imposing manipulative limitations. The Commissioner argues that the ALJ may rely on the opinion of a non-examining physician when it is supported by objective evidence. See Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990) ("[A]n ALJ may properly rely on a non-examining physician's assessment when, as in this case, those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician.").

17

Beginning in 2013, the Commissioner has taken the approach that in the case of a cessation of benefits, "the adjudicator reviewing the medical cessation determination or decision will decide whether the beneficiary is under a disability through the date of the adjudicator's determination or decision." Soc. Sec. Ruling, SSR 13-3P; Appeal of an Initial Med. Disability Cessation Determination or Decision, SSR 13-3P (S.S.A. Feb. 21, 2013). Thus, when the ALJ:

> determines the initial medical cessation determination was correct, he or she will then determine whether the beneficiary has again become disabled at any time through the date of his or her determination or decision because of a worsening of an existing impairment or the onset of a new impairment, if all other requirements for establishing a period of disability, including the duration and insured status requirements are met.

Id. Social Security Ruling 13-3P goes on to explain that where the claimant's "disability has medically ceased, the determination or decision must specifically address the initial cessation determination and the beneficiary's eligibility (or ineligibility) for a new period of disability through the date on which the appeal determination or decision is being made, or, if earlier, through the date last insured." Id.

Accordingly, upon review, the Court finds it useful in this case to consider the two time periods separately. There can be no dispute that Mr. Gilmore's disability had ceased on November 27, 2013. On that date, as described above, Mr. Gilmore's medical records showed no functional limitations and no treatment for hand or arm pain. Indeed, Mr. Gilmore only points to 2014 and 2015 evidence to support his claim of disability, which supports the Court's conclusion that there is no evidence to contradict the finding that Mr. Gilmore had experienced medical improvement and was no longer disabled on November 27, 2013.

The Court must also affirm the ALJ's residual functional capacity assessment through the date of her decision. Even considering the evidence cited by Mr. Gilmore, the Court finds there is substantial evidence to support the ALJ's determination that Mr. Gilmore does not have

18

manipulative limitations. Importantly, the ALJ was concerned that Mr. Gilmore suddenly began receiving treatment for his purported disability upon learning that his disability benefits had ceased. In November 2013, Dr. Mandich concluded that Mr. Gilmore had normal mobility of the thumb and normal grip strength, grasping, and dexterity bilaterally, and further, that he had normal range of motion of his right hand and all of the fingers, and could open and close his empty fist and perform other fast repetitive movements without any noticeable impairment. R. at 258. Although Mr. Gilmore had 4/5 grip and finger abduction on his right upper extremity when he visited Dr. Sarmini on August 19, 2014, and October 3, 2014, at his October visit, Mr. Gilmore also reported no significant weakness of his hands and reported only dropping things occasionally. As the ALJ noted, although the 2014 EMG/NCS showed no radial sensory potential, it also showed that all other nerves, including his radial motor nerves were within normal limits. The ALJ gave more weight to the motor nerve findings. Further, Mr. Gilmore's own testimony indicates nearly normal functioning of the right hand. Mr. Gilmore testified in July 2014 that he could eat and write using his right hand and that he could lift 40 pounds with his right arm. He did not complain of atrophy of the right arm. He said he could make a fist with his right hand, although not a tight one. He did say that he would drop things if he was doing chores. But in comparison, at the 2010 hearing prior to the original disability finding, Mr. Gilmore testified that he could only lift 5 pounds, that he could not push a lawnmower, and that he had trouble shaving and tying his shoes. In 2010, Mr. Gilmore testified that discomfort would keep him up at night, but there was no such testimony in 2015.

Mr. Gilmore insists that the ALJ must consider all evidence in adjudicating the claimant's disability status "and cannot 'pick and choose' only the evidence that supports his [or her] position." Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000). The Court notes that for an error to

justify reversal, it must have resulted in prejudice.  Jones v. Astrue, 691 F.3d 730, 734–35 (5th Cir. 2012). For example, in Heck v. Colvin, the claimant argued

> that the ALJ failed to consider her migraine condition in assessing whether she was disabled. However, as the Commissioner notes, [the claimant] does not identify any additional work-related limitations resulting from her migraines that the ALJ should have considered in assessing [her] claim. Without such additional limitations, any failure by the ALJ to specifically consider migraines as an additional impairment could not have prejudiced [the claimant.] Accordingly, we conclude that this alleged omission by the ALJ, even if found to be in error, "is irrelevant to the disposition of [claimant's] case" and thus cannot provide a basis for reversal.

674 F. App'x 411, 414 (5th Cir. 2017) (quotations omitted).

Here, Mr. Gilmore correctly notes that the ALJ did not address the 4/5 grip strength findings in August and October 2014, the positive Phalen's, Tinel's, and compression test findings in August 2014, or his gabapentin and Percocet prescriptions.[4] While such findings might be consistent with additional functional limitations, they are not evidence of functional limitations. The most comprehensive examination of Mr. Gilmore's functional capabilities remains that made by Dr. Mandich. Given Dr. Mandich's assessment, Dr. Michalik's assessment, the normal motor findings in the EMG/NCS, Mr. Gilmore's testimony, and the curious fact that Mr. Gilmore did not treat for his alleged disability until following the termination of his benefits, the Court finds the ALJ's failure to address the evidence cited by Mr. Gilmore  did not result in prejudice. In other words, the Court finds that this other evidence is not enough to find that the ALJ might have come to a different conclusion had she analyzed it.

---

[4] In support of his argument, Mr. Gilmore also points to his complaints of pain and the EMG/NCS findings, including the radial sensory neuropathy assessment. Unlike the evidence addressed in this paragraph, the ALJ analyzed the EMG/NCS evidence, R. at 17, and also considered at least some of his complaints of pain, R. at 16.

Accordingly, the Court finds that the ALJ's residual functional capacity assessment, which included functional limitations, but no limitations relating to fine motor skills, is supported by substantial evidence.

Moreover, it appears that the date of the ALJ's decision may not be the proper date through which to consider whether Mr. Gilmore again became disabled.  As noted above, where the ALJ finds that the state agency properly determined that disability ceased on the date of its cessation determination, the ALJ then considers whether the claimant became disabled again through the earlier of the date of decision or the claimant's date last insured. See SSR 13-3P, supra. It appears that Mr. Gilmore's date last insured was December 31, 2013.[5]  The medical evidence in the record for the period ending December 31, 2013, is the same as that for the period ending November 27, 2013, and can support no other conclusion but that Mr. Gilmore's disability had ceased.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 11) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

---

[5] Although the ALJ did not address Mr. Gilmore's date last insured in her decision dated January 15, 2016, the ALJ who issued a disability finding on June 21, 2010, determined that Mr. Gilmore remained insured through December 31, 2013. R. at 82, 84. Mr. Gilmore has only applied for disability insurance benefits under Title II of the Act and does not appear to have filed a claim for supplemental security income under Title XVI.

result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th

Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 9th day of February, 2018.


_____
Janis van Meerveld
United States Magistrate Judge

22